UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| JOEY HARMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 1:20-CV-318-KAC-CHS |
| | ) | |
| | ) | |
| UNUM LIFE INSURANCE COMPANY OF | ) | |
| AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR JUDGMENT

This case under the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*, (ERISA) is before the Court on (1) the "Motion for Judgment on the Record" [Doc. 27] filed by Defendants Unum Insurance Company of America and Unum Group Corporation (collectively, "Defendants"), Plaintiff Joey Harmon's Response [Doc. 44], and Defendants' Reply [Doc. 47]; and (2) Plaintiff's "Motion for Judgment on ERISA Record" [Doc. 33], Defendants' Response [Doc. 46], and Plaintiff's Reply [Doc. 48]. Plaintiff also filed a "Motion to Determine Extent of Deference Given to Unum's Decision" [Doc. 29], which the Court construes as a supplement to Plaintiff's "Motion for Judgment on ERISA Record" [Doc. 33]. The Court has reviewed the full administrative record in this case, which consists of more than 4,500 pages [*See* Docs. 19-1–19-23]. Because Defendants' decision to terminate Plaintiff's claims was not arbitrary and capricious, the Court **GRANTS** Defendants' "Motion for Judgment on the Record" [Doc. 27] and **DENIES** Plaintiff's "Motion for Judgment on ERISA Record" [Doc. 33].

## I. Factual Background

Plaintiff previously worked as a facilities technician for 24 Hour Fitness USA, Incorporated ("24 Hour Fitness") in Memphis, Tennessee [Docs. 19 at 6, 12; 19-1 at 60]. 24 Hour Fitness required a "facility technician" to "repair[] and maintain[] all buildings and equipment in assigned facilities, including operation of all club areas, earning acceptable Audit scores and preventative maintenance on equipment and facility" [Doc. 19-1 at 43 (Position Description)]. The "physical requirements" of that role included "lift[ing] a minimum of 50 lbs., bending, squatting, reaching, or being on feet for long periods of time" [*Id.* at 44]. On average, Plaintiff earned approximately $21.93 per hour or $3,801.20 per month at 24 Hour Fitness [Docs. 19 at 6; 19-1 at 223]. Before his time at 24 Hour Fitness, Plaintiff worked as a "certified pool operator" and "fitness equipment manufacturer certified technician" [*Id.* at 145]. On January 6, 2012, Plaintiff suffered an injury to his back while at work at 24 Hour Fitness [Doc. 19 at 12]. In November, he had back surgery in Memphis [Doc. 19 at 12, 47-48, 185]. He did not return to work and continued to live in Memphis[1] for some time [Docs. 19 at 12; 19-2 at 188]. Plaintiff filed claims for certain disability-related benefits on April 30, 2014 [Docs. 19-1 at 110, 131; 19-13 at 16].

Defendant Unum Life Insurance Company of America ("Unum") was the underwriter for the group long-term disability ("LTD") policy ("LTD Policy") and group life insurance policy ("LWOP Policy") issued to 24 Hour Fitness [Docs. 19 at 2, 6, 8; 19-1 at 66-108; 19-13 at 39, 41-100; 19-14 1-15]. Defendant Unum Group Corporation is Unum's parent company [Docs. 1 ¶ 8; 14 ¶ 8]. Both LTD and LWOP Policies stated:

> The Plan, acting through the Plan Administrator, ***delegates to Unum and its affiliate Unum Group discretionary authority to make benefit determinations***

---

[1] Plaintiff reported that he (1) "had moved to Memphis for the job," (2) "rent[ed] his own home to pay for the mortgage," (3) "[s]ta[y]ed with relatives in FL," and (4) "lived" in Florida from January 2013 through April 2014 [Docs. 19-1 at 60; 19-2 at 156; 19-16 at 36].

> *under the Plan*. Unum and Unum Group may act directly or through their
> employees and agents or further delegate their authority through contracts, letters
> or other documentation or procedures to other affiliates, persons or entities. Benefit
> determinations include determining eligibility for benefits and the amount of any
> benefits, resolving factual disputes, and interpreting and enforcing the provisions
> of the Plan. All benefit determinations must be reasonable and based on the terms
> of the Plan and the facts and circumstances of each claim.

[Docs. 19-1 at 104; 19-14 at 11 (emphasis added)]. Under the LTD and LWOP Policies, Unum

evaluated claims and made any payments directly to the employee beneficiary [Docs. 19-1 at 74;

19-3 at 55].

Both Policies provided benefits when a claimant qualified as "disabled." The LTD Policy

provided disability payments [Doc. 19-1 at 82-84]. As relevant here, the LTD Policy defined

"disabled," as "[a]fter 24 months of payments":

> [W]hen Unum determines that due to the same sickness or injury, you are unable
> to perform the duties of any *gainful occupation* for which you are reasonably fitted
> by education, training or experience.

[*Id.* at 82 (emphasis added)]. It defined "gainful occupation" as:

> [A]n occupation that is or can be expected to provide you with an income within
> 12 months of your return to work, that exceeds: 80% of your indexed monthly
> earnings, if you are working; or *60% of your indexed monthly earnings, if you are
> not working*.

[Doc. 19-1 at 95 (emphasis added)]. The LWOP Policy provided that if an employee qualifies as

"disabled," Unum would waive certain premiums [Doc. 19-13 at 44, 76]. The LWOP Policy

defined "disabled" as, nine (9) months after "a period of continuous disability,"

> [D]ue to the same injury or sickness, you are unable to perform the duties of any
> *gainful occupation* for which you are or become reasonably fitted by training,
> education or experience and which disability is, in fact, preventing you from
> engaging in any employment or occupation for wage or profit.

[Doc. 19-13 at 76-77, 100]. It defined "gainful occupation" as

3

[A]n occupation that within 12 months of your return to work is or can expected to provide you with an income that is at least equal to ***60% of your annual earnings in effect just prior to the date your disability began***.

[Doc. 19-13 at 100 (emphasis added)]. Neither Policy defined a particular market that Unum would use to determine the rate for "gainful occupation." The Policies provided that Unum (1) "may require you to be examined by a physician, other medical practitioner, [and]/or vocational expert of our choice," (2) "can require an examination as often as it is reasonable to do so," and (3) "may also require you to be interviewed by an authorized Unum Representative" [Docs. 19-1 at 82; 19-13 at 78].

The LTD Policy provided that LTD payments would end, as pertinent here, "on the earliest of the following":

- the date you are no longer disabled under the terms of the plan;
- the date you fail to submit proof of continuing disability;

[Doc. 19-1 at 87]. Likewise, the LWOP Policy provided that Unum would no longer waive premiums if, as pertinent here:

- you recover and you no longer are disabled;
- you fail to give us proper proof that you remain disabled;

[Doc. 19-13 at 77].

The Policies also provided a mechanism to appeal an adverse decision. On appeal, Unum would "take into account all new information" and afford "[n]o deference" "to the initial determination" [Docs. 19-1 at 102; 19-14 at 8-9]. "[A] different person from the person who made the initial determination" would conduct the appellate review, and that person "will not be the original decision maker's subordinate" [Docs. 19-1 at 102; 19-14 at 9]. If Unum denied the initial claim "on the grounds of a medical judgment," then, on appeal, Unum would "consult with a health

4

professional with appropriate training and experience" who is not the individual "consulted during the initial determination or a subordinate" [Docs. 19-1 at 102; 19-14 at 9].

To evaluate whether Plaintiff qualified as "disabled," Unum received records from Plaintiff's treatment providers, and a Unum vocational rehabilitation consultant ("VRC") completed a vocational assessment ("VA") [Doc. 19-18 at 48]. Plaintiff's orthopedic surgeon, Dr. Jonathan A. Hyde in Miami, Florida, concluded that Plaintiff achieved medical maximum improvement ("MMI") status for Plaintiff's diagnosis of "post laminectomy syndrome" in May 2013 [Docs. 19 at 12, 45; 19-1 at 142]. Dr. Hyde saw Plaintiff seven (7) times in 2013 for various "low back pain complaints" [*See* Doc. 19-3 at 124, 128, 129, 134, 141, 145, 147, 152, 156, 161-62]. An August 17, 2013 MRI of Plaintiff's lumbar spine showed evidence of "disc bulges from L3-S1 with L5/S1 disc bulge asymmetric to the left deforming left paracentral thecal sac and contacting left S1 nerve root" [*Id.* at 168-69].

During Dr. Hyde's last visit with Plaintiff on November 4, 2013, Dr. Hyde (1) reported "[n]o change in restrictions or maximum medical improvement date" and (2) permanently restricted Plaintiff to "moderate work demand with no lifting greater than 35 lbs." [Docs. 19-1 at 34; 19-16 at 51]. The VA classified Plaintiff's occupation within a "Facilities Maintenance" category, which involved "perform[ing] at the medium physical demand level (lifting, carrying, pushing, pulling 20-50 lb. occasionally, 10-25 lb. frequently or up to 10 lb. constantly)" and "sitting, stopping (bending), kneeling, crouching, crawling, climbing, and balancing – occasionally; and reaching (a combination of all directions), standing and walking – frequently" [Doc. 19-1 at 136].

On May 26, 2014, Unum Senior Clinical Consultant Diane Suess concluded that it was "reasonable" that Plaintiff "would not have been able to perform" his occupational duties at 24

5

Hour Fitness [Doc. 19-18 at 46-49]. Suess viewed Dr. Hyde's November 2013 permanent thirty-five-pound (35-pound) restriction as "reasonable" because Plaintiff's "back pain has not resolved" "[d]espite conservative treatment and surgical intervention," and "his functional capacity is unlikely to change or improve" [Doc. 19-18 at 48-49]. Suess also reviewed an April 30, 2014 workers' compensation[2] independent medical evaluation ("IME") by orthopedic surgeon Dr. Apurva R. Dalal that concluded Plaintiff "should avoid lifting any weight more than 10 pounds" and "avoid bending, pulling, pushing and lifting" [Doc. 19-1 at 161, 164]. Based on the IME, Suess remarked that Plaintiff's "clinical picture has worsened" since Dr. Hyde's final evaluation because of the reported "severe muscle spasms, decreased sensation" "on the left side," and "radiculopathy with loss of strength in the left lower extremity" [Doc. 19-18 at 50]. Suess viewed the IME's ten-pound (10-pound) restriction as "reasonable," and recommended that Plaintiff "avoid bending, pulling, pushing and lifting" [*Id.*]. Based on Suess's evaluation of Plaintiff's medical records and VA, Unum approved Plaintiff's claims for LTD and LWOP benefits on June 6, 2014 [*See* Docs. 19-2 at 67-74; 19-13 at 11; 19-18 at 65, 71-72].

Over the next few years, Unum continued to evaluate Plaintiff's claims and pay him benefits under the "gainful occupation" definition of "disabled." On August 15, 2014, a new VRC reviewed Plaintiff's "skills for gainful alternate occupations within the Sedentary or Light physical demand level" based on Plaintiff's residence in Memphis[3] [Doc. 19-2 at 188]. The VRC also reviewed Plaintiff's former occupation, qualifications, and education [*Id.*]. The VRC found it

---

[2] Plaintiff and 24 Hour Fitness reached a workers' compensation settlement agreement on May 30, 2014 [*See id.* at 58-63]. The agreement listed Plaintiff as a "resident of Dade County" who "resides in Miami, FL" [*Id.* at 59].

[3] During a call on September 17, 2014 with his disability benefits specialist, Plaintiff reported that he "travels to Florida for assistance," "has family in Florida," and visited Florida approximately two (2) times each year [Doc. 19-2 at 193].

"unlikely" that Plaintiff "would have sufficient skills for gainful alternate occupations within the Sedentary or Light physical demands" [*Id.*].  In October 2015, Plaintiff reported that his "back pain is still present," and he reported restrictions related to "[l]ifting, sitting, walking," and "standing" [*Id.* at 235].  In May 2016, Unum Director Wesley Ridlon recommended "capacity review" [Doc. 19-3 at 30].  Based on Plaintiff's location in Memphis, Senior VRC Norma Parras-Potenzo conducted a skills assessment and calculated Plaintiff's gainful occupational earnings.  She concluded that "less physically demanding occupations" "would not provide a gainful [occupation] wage of $13.54 per hour in Memphis" [*Id.* at 42].

Both Parties remained in status quo through Summer and Fall 2016.  On May 27, 2016, Unum attempted to mail Plaintiff a letter about its ongoing evaluation of his claims [*Id.* at 48].  A month later, Plaintiff reported that he "never got [Unum's] letter" because he was "in Florida right now" [*Id.* at 53].  He "provided a temporary address" in Florida "to use for the time being" [*Id.*].  Unum added that "temporary address" to Plaintiff's file [*See* Doc. 19-18 at 81].  In a July 24, 2016 letter to Unum, Plaintiff detailed "a level of pain and discomfort 24 hours daily" that he alleviated through icing and "light workouts every other day" [Doc. 19-3 at 71 (describing "3 forms" of exercise and a daily activity list), 121].  On August 15, 2016, Plaintiff's primary care physician, Dr. Harris Mones in Miami, Florida, provided Unum Plaintiff's medical records [*Id.* at 196].[4]  In visits with Dr. Mones, Plaintiff reported "waxing and waning" back pain [*Id.* at 200].  When asked by Unum to clarify Plaintiff's "work capacity," Dr. Mones stated that Plaintiff "should follow up in the clinic" [*Id.* at 219].  A week later, Dr. Mones provided that Plaintiff could not perform

---

[4] Plaintiff had not seen Dr. Hyde, his orthopedic surgeon since November 2013, when Dr. Hyde kept Plaintiff at his MMI with the then-existing thirty-five-pound (35-pound) weight restriction [*See id.* at 124, 128, 129, 134, 141, 145, 147, 152, 156, 161-62].

certain work demands because he "[w]as given a maximum 35 lb lifting restriction," referencing Dr. Hyde's November 2013 permanent work restriction [Doc. 19-4 at 27].

On August 30, 2016, Unum Director Ridlon remarked that Plaintiff "is not in active treatment at this time" and recommended an "activities check" to determine Plaintiff's "level of activity" [*Id.* at 30]. Contractors for Unum attempted to observe Plaintiff at the address he provided in Miami but could not complete a review [*See id.* at 39]. A September 14, 2016 Medical Issue Statement by Unum Senior Clinical Consultant Deborah C. Ainscough, a registered nurse, provided that Plaintiff "continues" to report lower back pain "causing decreased level of activities" [*Id.* at 51-54]. Based on Dr. Hyde's 2013 restriction and Plaintiff's continued self-reports of pain, Nurse Ainscough found it "reasonable" that Plaintiff "is precluded from lifting > 35 lbs" [*Id.* at 54]. As of September 15, 2016, Unum—through Director Ridlon—recommended transferring Plaintiff's case for ongoing review based on Nurse Ainscough's conclusions [*Id.* at 61].

On February 2, 2017, an Administrative Law Judge (ALJ) for the Social Security Administration (SSA) denied a disability claim Plaintiff submitted [*Id.* at 71].[5] The ALJ concluded that although Plaintiff had a "severe impairment," specifically, "degenerative disc disease," Plaintiff "ha[d] not been under a disability within the meaning of the Social Security Act" [*Id.* at 74, 76]. The ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects" of his symptoms were "not entirely consistent with the medical evidence," which reflected "improvement in symptoms after surgery" and "few complaints of limitations in functioning" [*Id.* at 78-79]. Based on this evidence, the ALJ concluded that Plaintiff had "the capacity for work activity," including "light work" [*Id.* at 80]. The ALJ provided

---

[5] Plaintiff received the ALJ's decision at a residence in Miami, Florida [*Id.*].

8

three (3) positions that Plaintiff "would be able to perform" considering his "age, education, work experience, and residual functioning capacity" [*Id.* at 81].

After the ALJ's decision, Unum recommended "evaluating" Plaintiff's claims for eligibility [*Id.* at 92]. Unum Director Jo-Anne Copeland and a VRC reviewed the occupations identified in the ruling [*Id.*]. But they determined that those occupations "when reviewed in current labor market or past would not meet the gainful [occupation] wage" [*Id.*]. They recommended "revisit[ing] the vocational aspect" "in 12 months as wages may increase or other occupations may be appropriate to consider at that time (possible full skills assessment)" [*Id.*].

The situation changed in Fall 2017. On September 22, 2017, Plaintiff provided a "[c]onfirmed address" in Miami, Florida, and he reported "liv[ing] in downtown Miami" [*Id.* at 97-98]. He stated that he "no longer participat[ed] in physical therapy" but did "his own exercises," including "30-45 minutes every single day" and "normally lift[ing] about 10-15 pounds" "repetitively" [*Id.* at 97]. Plaintiff had not returned to work because of "the pain" and his "need[] to rest" and "'respect' his injury" [*Id.* at 98].

Unum continued to review the situation. As part of the review process, Senior VRC Parras-Potenzo "revisit[ed] the skills assessment" to determine whether Plaintiff "ha[d] skills for [an] alternate gainful occupation" or a "less physically demanding" occupation given the "new labor market" in Miami, Florida, where Plaintiff "presently reside[d]" [*Id.* at 103-04]. Parras-Potenzo analyzed various items, including Plaintiff's prior position with 24 Hour Fitness, the duties of that position, Plaintiff's medical restrictions, the SSA ALJ's findings, and Plaintiff's employment history, related certifications, and occupational competencies [*See id.* at 104]. Based on this analysis and the existing record, Parras-Potenzo concluded that Plaintiff "would have skills for alternate occupations which are performed with occasional lifting up to 20 pounds, frequently

up to 10 pounds; frequent sitting with occasional standing, walking with ability to make positional ch[an]ges" [*Id.* at 104-05].

With this new analysis, Unum transferred Plaintiff's file for "medical and vocational review," which involved acquiring a new round of medical documentation [*Id.* at 106-08]. Dr. Mones—who Plaintiff confirmed was his only treating provider at the time—provided updated records [*See id.* at 119]. Dr. Mones saw Plaintiff twice in September 2017 for reports of pain in Plaintiff's back, right elbow, right shoulder, and right knee after a car accident [*Id.* at 133]. An x-ray of Plaintiff's lumbar spine was "unremarkable," with "preserved disc spaces," "[n]ormal alignment," and no "degenerative change" [*Id.* at 135-36]. At the second appointment, Plaintiff reported that he "ha[d] improved significantly," "ha[d] not started any physical therapy," and "his shoulder [wa]s still aching slightly but all other pains [we]re much better" [*Id.* at 135; *see also id.* at 149 (Plaintiff stated in a call that he "ha[d] not attended any" physical therapy and "d[id]n't feel he will need to" attend physical therapy)].

In addition, Unum asked Dr. Mones to provide his opinion regarding Plaintiff's ability to return to work under certain conditions. Specifically, on October 11, 2017, Unum sent the below inquiry to Dr. Mones:

> We are interested in whether you would agree that Mr. Harmon has the physical ability to return to work and whether you would release him to return to work full time (8 hours/day, 5 days/week) in an occupation with the following demands:
>
> - Occasional lifting up to 20 pounds, frequently up to 10 pounds.
> - Frequent sitting with occasional standing, walking with ability to make positional changes.
>
> **Definitions of Frequency per the Revised Handbook for Analyzing Jobs:**
> 'Occasionally'= up to 1/3 of a work day *(0 - 2.5 hours a day in an 8-hour workday)*
> 'Frequently' = up to 2/3 of a work day *(2.5 - 5.5 hours a day in an 8-hour workday)*
> 'Constantly' = over 2/3 of a work day *(5.5+ hours a day in an 8-hour workday)*
>
> I Agree:_____          I Do Not Agree:_____

[*Id.* at 121, 129-30]. The second page of the inquiry provided a space for Dr. Mones to sign and date the form [*Id.* at 122].

After Unum did not receive a response from Dr. Mones, Unum called Dr. Mones on October 18 [*Id.* at 141]. A representative from Dr. Mones's office stated that Dr. Mones "didn't receive the request" and asked Unum to fax the request again [*Id.*]. On October 23, Dr. Mones's office faxed the following to Unum:

I Agree:_____     I Do Not Agree: ✓_____

If you do not agree, please provide your rationale: Pt need to return to the clinic for evaluation and current capibilities prior to returning to work

[*Id.* at 143-44]. Then on October 30, Dr. Mones's office faxed the below to Unum:

We are interested in whether you would agree that Mr. Harmon has the physical ability to return to work and whether you would release him to return to work full time (8 hours/day, 5 days/week) in an occupation with the following demands:

- Occasional lifting up to 20 pounds, frequently up to 10 pounds.
- Frequent sitting with occasional standing, walking with ability to make positional changes.

Definitions of Frequency per the Revised Handbook for Analyzing Jobs:
'Occasionally'= up to 1/3 of a work day *(0 - 2.5 hours a day in an 8-hour workday)*
'Frequently' = up to 2/3 of a work day *(2.5 - 5.5 hours a day in an 8-hour workday)*
'Constantly' = over 2/3 of a work day *(5.5+ hours a day in an 8-hour workday)*

I Agree: ✓_____     I Do Not Agree:_____

[*Id.* at 152-53]. Dr. Mones did not sign or date either the October 23 or October 30 form.

Having received both the October 23 and October 30 forms that stated different conclusions, Unum left a message for Dr. Mones on October 30 [*Id.* at 161]. Unum asked whether Dr. Mones evaluated Plaintiff "between the 23rd and the 30th" of October and whether the October 30 form represented Dr. Mones's "most current opinion" because "both responses received did not include [Dr. Mones's] signature or date" [*Id.*]. Unum requested that Dr. Mones "refax the form"

11

with his signature and date [*Id.*]. On October 31, Unum Director Ridlon spoke with Dr. Mones who confirmed that he had not seen Plaintiff since September 2017, and Plaintiff "d[id] not have a follow-up appointment" scheduled "at this time" [*Id.* at 163].

On November 2, Unum again called Dr. Mones's office to ask whether Dr. Mones's October 30 form represented his "most recent opinion" [*Id.* at 169]. Dr. Mones's medical assistant answered and stated that Dr. Mones would call Unum back [*Id.*]. Later that day, Dr. Mones's physician's assistant called Unum back and appears to have stated that the "10/30/2017 opinion" "is the most recent opinion" but that Dr. Mones "d[id] not have" a "revised Physician's Narrative" to review [*Id.* at 179]. To confirm, on November 3, Unum sent yet another form to Dr. Mones:

We are continuing our review of Joey Harmon's disability claim and would appreciate your assistance in providing additional information.

On October 30, 2017, we received the attached response from you indicating you agree Mr. Harmon can perform the demands outlined and are releasing him to return to work full time.

Does this continue to be your current opinion?

Yes_____          No_____          I am not commenting_____

If no, please explain.

Signature_____          Date_____

[*Id.* at 177]. By November 13, 2017, Unum had not received a response from Dr. Mones [*Id.* at 183].

In the meantime, on November 3, Unum Senior Clinical Consultant Nurse Ainscough performed a Clinical Analysis based on Plaintiff's self-reported activities and clinical records,

including Plaintiff's last MRI from August 2013, Dr. Hyde's November 2013 restriction, and Dr. Dalal's 2014 IME [*See id.* at 165-68]. In reviewing Dr. Mones's records, Nurse Ainscough noted (1) "there are no physical exam findings documented other than" Plaintiff's "reports of pain" and (2) Plaintiff's September 22, 2017 "Lumbar spine Xray shows normal alignment with disc space well preserved and no degenerative change" [*Id.* at 167]. Nurse Ainscough also noted Dr. Mones's "10/30/2017 release" to a "functional capacity" "which is less than had been evaluated" in a former clinical review [*Id.*]. Nurse Ainscough concluded "there is no current medical documentation" to support Plaintiff "be[ing] precluded from" "occasional lifting up to 20 pounds, frequently up to 10 pounds; frequent sitting with occasional standing, walking with ability to make positional changes" [*Id.* at 167-68].

Also on November 3, Unum VRC Carrie Cousins conducted a vocational review of Plaintiff's file "to determine whether another occupation exists" that Plaintiff "could reasonably be expected to perform satisfactorily in light of his[] age, education, training[,] experience[,] station in life, physical and mental capacity" [*Id.* at 172]. To do so, Cousins reviewed Unum's initial skills assessments and the two (2) skills revisits, the gainful occupation calculations, Nurse Ainscough's Clinical Analysis, Plaintiff's communications with Unum representatives, and Plaintiff's work history, skills, and qualifications [*Id.* at 172]. Cousins evaluated Plaintiff's file based on his residence in Miami [*Id.* at 173]. She evaluated certain potential gainful occupations, specifically, "Inspector Component Parts," "Final Inspector," and "Security Guard," based on Plaintiff's "demonstrated skills/knowledge" and his "training, education, and experience" [*Id.* at 173-74]. She noted Plaintiff could perform these occupations "within the functional capacity" of "[o]ccasional lifting up to 20 pounds, frequently up to 10 pounds; frequently sitting with occasional standing," and "walking with ability to make positional changes" [*Id.* at 173].

13

Plaintiff would not need further training for the occupations because they would be "consistent with" Plaintiff's "work history," "certificates," and "high school diploma" [*Id.*]. These positions "provide[d] a wage range of $13.57 to $15.28 per hour," which "exceeds 60% of pre-disability earnings" [*Id.*].

On November 15, 2017, Unum recommended a "non-compensable decision" based on Cousins's vocational review, Dr. Mones's October 30 opinion, and Nurse Ainscough's clinical analysis [*Id.* at 185]. Quality Compliance Consultant Elaine Brooks approved the recommendation [*Id.* at 185-86]. She reasoned that Dr. Mones "released" Plaintiff "to full time light functional range," Plaintiff's medical records and self-reported activity level are "consistent" with that functional capacity, and the vocational assessment "identified occupations" Plaintiff could "perform that are consistent with gainful occupations" and "do not exceed his functional capacity" [*Id.* at 186].

In November 2017, Unum stopped providing benefits to Plaintiff under both the LTD and LWOP Policies. On November 17, Unum informed Plaintiff that it could not continue paying LTD benefits because Unum determined that Plaintiff could "perform the duties of other gainful occupations" and was therefore "not disabled under the policy" [*Id.* at 189-90]. Unum relied on Dr. Mones's October 30 opinion, Nurse Ainscough's clinical analysis, Plaintiff's "reported daily activities," its vocational analysis, and the SSA ALJ's denial of Social Security disability benefits in making this determination [*Id.* at 190-91]. And on November 20, Unum informed Plaintiff that it could not continue to waive the life insurance premium under the LWOP Policy because Unum determined that Plaintiff could "perform the alternate gainful occupations" and was therefore "no longer disabled" under that Policy [*See* Doc. 19-20 at 44-45]. In making this determination, Unum "reviewed information contained in" Plaintiff's LTD claim file [*Id.* at 45].

Plaintiff appealed Unum's determination, submitting to Unum a list of 162 "[p]roblems" and a separate "Appeal Summary" outlining nineteen (19) disputes and rebuttals [*See* Docs. 19-5 at 13-250; 19-6 at 1-250; 19-7 at 1-127, 133-250; 19-8 at 1-177, 180-250; 19-9 at 1-111, 115-84, 187-250; 19-10 1-114, 116-250; 19-11 at 1-196; 19-20 at 60-200; 19-21 at 1-158, 161-200; 19-22 at 1-200; 19-23 at 1-74]. Some "problems" related to Unum's evaluation of Plaintiff's condition, including that Unum did not sufficiently consider Plaintiff's level of pain [*See* Doc. 19-5 at 16]. Others focused on a lack of "therapy notes" from certain providers, including an authorized provider for Plaintiff's workers' compensation claim, orthopedic surgeon Dr. Kenneth Jarolem [*Id.* at 17; Doc. 19-20; 19-7 at 133]. Plaintiff provided records from an April 19, 2018 appointment with Dr. Jarolem, indicating that Dr. Jarolem limited Plaintiff to "work restrictions of no lifting over 5 pounds" [Doc. 19-8 at 190]. Plaintiff also stated that "TN is the labor market" and that he "provided a TEMPORARY address in FL for the time being" [Doc. 19-7 at 134, 136]. Plaintiff referenced Dr. Mones's October 2017 opinions and included a new January 26, 2018 letter from Dr. Mones that sought "to clarify [his office's] medical records," specifically explaining that:

> [W]e are in possession of a fax regarding patient Joey Harmon that was dated October 23, 2017. This fax was in fact sent by my physician assistant to UNUM where we clearly state when asked whether it is our position that the patient is physically able to return to work, we clearly check the box that states "I do not agree." Additionally, in my physician assistants [sic] handwriting it states "the patient needs to return to the clinic for evaluation on current capabilities prior to returning to work."

> I am in possession of another fax dated October 30, 2017 where the box was checked "I agree" that the patient can return to work. No where [sic] on that form is there any designation that I or my physician assistant completed the form. We have no recollection of ever seeing a second form until most recently.

> Based upon a review of this patient's prior medical records, it is my opinion that the patient is in fact unable to return to work.

[Doc. 19-8 at 203].

15

To evaluate Plaintiff's appeal, Unum reassigned Plaintiff's LTD and LWOP file to a separate appeals team [*See* Doc. 19-11 at 202-06]. Unum requested and received additional records from Dr. Mones for Plaintiff's visits after November 2017 [*See* Docs. 19-11 at 213-19-12 at 25]. Dr. Mones saw Plaintiff on December 21, 2017 to discuss the two (2) forms Dr. Mones's office sent to Unum in October 2017 [*See* Doc. 19-11 at 224]. During the December 21 appointment, Dr. Mones noted that Plaintiff had a "long history of back pain" related to a "herniated disc" that "continues" to "bother[]" Plaintiff [*Id.*]. Dr. Mones wrote that when he saw Plaintiff in September 2017, Plaintiff "d[id] not complain[] of back pain but had other musculoskeletal complaints secondary to the trauma of the motor vehicle accident," which "have improved" [*Id.*]. During the December 21 examination, Dr. Mones reported that Plaintiff had "limited mobility of the lumbar spine with muscle spasm otherwise unremarkable" [*Id.* at 225]. Dr. Mones further wrote that he would "review" Plaintiff's "paperwork" and "contact the insurance carrier" [*Id.*]. Dr. Mones "advised" Plaintiff that his office "ha[d] no recollection of any faxes" stating that Plaintiff "could return to work as we did not address his low back issues" [*Id.*].

After the December 21 visit, Dr. Mones saw Plaintiff on (1) January 26, 2018 for "bilateral foot pain" "around the cuticles of all his toes," (2) February 1, 2018 for "results," (3) and June 4, 2018 for Plaintiff's annual physical [*Id.* at 219-21]. At the annual physical on June 4, 2018, Plaintiff was "without complaints," "denie[d] back pain," and had "full range of motion" in his "lumbar spine" [*Id.* at 223-24]. On June 22, 2018, Dr. Mones noted that Plaintiff "has also been seeing his orthopedic Dr. Kenneth Jarolem for his on going [sic] back pain" [Doc. 19-12 at 54].

Unum also requested and received Plaintiff's medical records from Dr. Jarolem dating back to 2016 [*Id.* at 31, 33]. Dr. Jarolem only saw Plaintiff twice, and both of those appointments occurred in 2018—after Unum terminated Plaintiff's benefits [*Id.* at 33-37]. On April 19, 2018,

Plaintiff saw Dr. Jarolem for "low back pain" "going down into left leg" [*Id.* at 37]. Dr. Jarolem wrote that he had seen Plaintiff "in the remote past for similar complaints" [*Id.*]. During a physical examination, Dr. Jarolem noted "tenderness across the lumbosacral junction" and that "[s]traight leg raising on the left produced pain at the posterior lateral calf" but there were "no deficits" [*Id.*]. X-rays of Plaintiff's lumbar spine revealed "a neutral alignment" [*Id.*]. Dr Jarolem diagnosed Plaintiff with "[l]ow back pain," "[i]ntervertebral disc disorders with radiculopathy, lumbar region," "[l]umbago," and "[o]ther unspecified disc disorder, lumbar region" [*Id.* at 38]. Dr. Jarolem recommended physical therapy and stated that Plaintiff "remains with work restriction of no lifting over 5 pounds" [*Id.*]. On May 24, 2018, Dr. Jarolem saw Plaintiff for a follow-up appointment relating to Plaintiff's "[l]ow back pain with left posterior thigh radiation" [*Id.* at 34]. Plaintiff reported that he had not started physical therapy [*Id.*]. At the appointment, Plaintiff "noted substantial increase in his overall pain" with "no known inciting event" [*Id.*]. Dr. Jarolem noted "diffuse tenderness across the lumbosacral junction" and that "[s]traight leg raising on the left produced back and buttock pain" but "no motor defects" [*Id.*]. Dr. Jarolem stated that Plaintiff "remains with work restrictions of no lifting over 5 pounds" [*Id.*].

Unum then referred Plaintiff's file for a medical and forum review "to determine if [restrictions and limitations] precluding light level work are supported beyond 11/17/17, and to discuss if peer contact is needed with Dr. Jarolem" [*Id.* at 75-76]. Unum Director Craig Johnson recommended (1) contacting Dr. Mones to "clarify" his "notes" about releasing Plaintiff to work and (2) "review[ing] records" from Dr. Jarolem [*Id.* at 78]. Because Plaintiff "was not in active treatment" with Dr. Jarolem "from 12/2015 to 4/2018," Director Johnson determined that Unum did not need to contact Dr. Jarolem [*Id.*]. Director Johnson recommended that a clinical consultant "review" the records and "refer[]" them to an Unum on-site physician "to evaluate" [*Id.*].

17

Unum Appeals Senior Clinical Consultant Tina Marie Tirabassi, a registered nurse, conducted "a full review of the medical record" and Nurse Ainscough's clinical analyses in 2016 and 2017 to inform Nurse Tirabassi's own "independent analysis" and conclusions [*Id.* at 82-83]. Nurse Tirabassi noted that Dr. Jarolem's medical records are only from "approximately five months after" Unum denied Plaintiff's claims [*Id.* at 83]. Plaintiff did not see Dr. Jarolem from 2016 to November 2017 when Unum denied Plaintiff's claims [*Id.*]. Nurse Tirabassi also noted that Plaintiff had an IME in 2014 with Dr. Dalal, which resulted in lifting restrictions of ten (10) pounds [*Id.* at 85]. Since then, however, "there have been no recommendations" for any clinical procedures or "any medication changes" despite Plaintiff's continued "radiating complaints" [*Id.*]. Nurse Tirabassi also noted that Plaintiff "has not followed up with" physical therapy "as would be expected given complaints and reported impact on functioning" [*Id.*]. Additionally, "[r]epeated diagnostics" "have not changed over time" and "[e]xams over time" "have been normal" [*Id.*]. Nurse Tirabassi remarked that "[t]he frequency" of Plaintiff's visits with Dr. Mones for Plaintiff's "back complaints and impact on functioning" combined with the "lack of any other treating providers does not indicate a severity of findings precluding the below level of outlined functioning" [*Id.*]. She concluded that "[i]t is unclear" why Plaintiff "would not be able to have the . . . outlined functional capacity" and deferred to the on-site physician "for additional analysis and comment" regarding Plaintiff's reported "radiating low back pain" [*Id.* at 85-86].

Unum on-site physician, Dr. Beth Schnars, a board-certified doctor of internal medicine, then reviewed Plaintiff's file. Dr. Schnars "completed a full review of the medical record," including Nurse Tirabassi's clinical report and Nurse Ainscough's two (2) prior clinical analyses, to conduct Dr. Schnars's own "independent analysis" and "form[]" Dr. Schnars's own conclusions [*Id.* at 90]. Dr. Schnars addressed Dr. Hyde's 2013 thirty-five-pound (35-pound) lifting restriction,

18

Dr. Dalal's 2014 IME and ten-pound (10-pound) lifting restriction, and Dr. Jarolem's 2018 five-pound (5-pound) lifting restriction [*Id.* at 90-92]. She concluded that medical records fail to support each restriction and "do not describe significant abnormalities of physical exam, frequency of evaluation or intensity of treatment" [*Id.* at 91]. Dr. Schnars opined that Dr. Dalal's 2014 restriction was "inconsistent with other provider[s]" and "MRI studies" [*Id.* at 92]. She likewise concluded that restrictions by Dr. Hyde in 2013 and Dr. Jarolem in 2018 were inconsistent with Plaintiff's "[l]evel of personal activity"—including "work[ing] out" for "30-45 minutes/day" and lifting ten (10) to fifteen (15) pounds—and the "underlying organic pathology on prior MRI studies," namely, Plaintiff's last MRI in 2014 [*Id.*]. In reviewing Plaintiff's medical records from Dr. Mones, Dr. Schnars noted "very limited mention of chronic pain issues," "[n]o additional pain medication," "limited" "[m]usculoskeletal exams," and "unremarkable X-rays" [*Id.*]. She also noted that Plaintiff obtained "no additional subspecialty evaluations" for his low back pain from November 2013 to April 2018 [*Id.*]. She acknowledged Plaintiff's asserted "substantial limitations," but she nonetheless concluded that the "medical records," "exam findings," "limited pain management," a "paucity of axial/neurologic exams," and "large gasp [sic] in subspecialty evaluation" are collectively "inconsistent" with the "severity of reported pain" [*Id.*]. Ultimately, Dr. Schnars concluded that "[b]ased on the weight of the medical evidence submitted, there is no physiologic evidence to support ongoing impairment which would support inability to perform" the functional requirements of "[o]ccasional lifting up to 20 pounds, frequently up to 10 pounds; frequent sitting with occasional standing, walking with ability to make positional changes" [*Id.* at 91].

Dr. Schnars specifically addressed Dr. Mones's opinion. She attempted to contact Dr. Mones by phone on July 12, 2018 [*Id.* at 94]. When Dr. Schnars did not reach Dr. Mones, Dr.

Schnars sent Dr. Mones a fax detailing her medical opinions and making specific inquiries as set forth below.

It is my opinion that the medical records do not support ongoing impairment which would preclude full time work capacity from 11/18/17 onward at the light level as defined below:

Ø   Occasional lifting up to 20 pounds, frequently up to 10 pounds; frequent sitting with occasional standing, walking with ability to make positional changes

You have opined in your letter of advocacy dated 1/26/18 that Mr. Harmon was unable to work.

•    Other than Mr. Harmon's reports of limitations from chronic LBP, what additional medical information and/or diagnostic testing did you rely on to base your opinion that he cannot work?

•    Is there any medical reason that the claimant could not work if they wanted too?

[*Id.* at 90-92, 96]. In response, Dr. Mones wrote:

> During our examination on 12/21/2017 of patient Joey Harmon . . . at which time we also reviewed the patients [sic] prior medical records, it was my opinion that the patient is in fact unable to return to work. That opinion is based upon the records from other medical facilities that were reviewed in addition to my exam on 12/21/17. As stated in my letter January 26, 2018. [sic] It is in [sic] my opinion that that patient is in fact unable to return to work.

[*Id.* at 107]. Dr. Schnars reviewed Dr. Mones's letter and stated "[t]here was little elaboration as to the reasoning" for Dr. Mones's opinion beyond Dr. Mones's "review of the medical records and the 12/17 exam which were very limited in scope" [*Id.* at 109]. Dr. Schnars therefore concluded that Dr. Mones's "response does not alter [her] previous opinion" [*Id.*].

On August 9, 2018, Unum informed Plaintiff that it "determined the decisions on [Plaintiff's] claims are correct" because Plaintiff was "able to perform the duties of alternate gainful occupations" and therefore "no longer me[]t the policy definitions of disability" [*Id.* at 116; Doc. 19-23 at 90]. The decision referenced Dr. Schnars's evaluation of Plaintiff's appeal, including Plaintiff's records and the restrictions recommended by Dr. Hyde, Dr. Dalal, Dr. Mones,

20

and Dr. Jarolem [*Id.* at 117-18]. It also referenced the SSA ALJ's determination that Plaintiff did not qualify as "disabled" under the Social Security Act [*Id.* at 118]. And it referenced Plaintiff's self-reported activity levels in conjunction with his "substantial limitations" [*Id.*]. The decision specifically addressed Plaintiff's "appeal letter" and "multiple exhibits" [*Id.* at 119]. Unum stated that Dr. Schnars "attempted to contact Dr. Mones," "sent a letter" to him, and received his "written response" but concluded that Dr. Mones's "response did not change" Dr. Schnars's opinion [*Id.* at 120]. Unum also stated that Dr. Jarolem's records did not reflect that Plaintiff "w[as] in active treatment" when Plaintiff's benefits ended, "with a gap in treatment from December 2015 to April 2018" [*Id.*]. Finally, Unum addressed Plaintiff's change in address, stating that Plaintiff "provided a Florida mailing address," did not "advise[] that" the "mailing address should be changed back" to Tennessee, and listed a mailing address in Miami, Florida in a November 26, 2017 letter "requesting a copy" of the claim file [*Id.*]. Unum concluded that "the decision to deny benefits" on Plaintiff's claims was "appropriate" and that the record "supports" a conclusion that Plaintiff was "able to perform the duties of the identified alternate gainful occupations" [*Id.*].

## II.    Procedural Background

On November 13, 2020, Plaintiff filed a Complaint under ERISA for LTD "plan benefits" (Count One) and "life insurance plan benefits" (Count Two) [Doc. 1 at 1, 8-9]. Plaintiff alleged that Defendants' denial of Plaintiff's LTD and LWOP claims was "arbitrary and capricious" and that Plaintiff "has been and continues to be disabled" under both Policies [Doc. 1 ¶¶ 37-38, 59, 64, 72]. Plaintiff specifically alleged that Defendants "reli[ed] on an unsigned form" from Dr. Mones's office and made a "last minute switch of labor market to Miami instead of Memphis" [*Id.* ¶ 37]. Plaintiff further alleged that Defendants had "a perpetual conflict of interest" impacting claim determinations because Defendants paid benefits out of their "own funds," which

21

"influenced" their "decision-making" and incentivized "claim handlers to terminate a specified number of claims every month," including Plaintiff's claims [*Id.* ¶¶ 42-44, 54-55].

Defendants filed a "Motion for Judgment on the Record," [Doc. 27], asking the Court to "dismiss Plaintiff's claim for benefits" and "affirm" Defendants' "determination that Plaintiff was not eligible to receive further benefits" under both the LTD and LWOP Policies, [Docs. 27 at 1; 28 at 24]. Defendants asserted that their decision to terminate Plaintiffs' benefits "was reasonable and supported by the record" after an "extensive and thorough review" [Docs. 28 at 23; 47 at 2].

Plaintiff filed his own "Motion for Judgment on ERISA Record," asserting that Defendants' decision to terminate his benefits was arbitrary and capricious [Doc. 33]. Plaintiff also separately filed a supplement "to Determine Extent of Deference Given to Unum's Decision," [Doc. 29], asking the Court to "give little, if any, deference to" Defendants' decision because of the "conflict of interest" from Defendants' role as claims handler and benefits distributor, [*id.* at 1; *see also* Docs. 30 at 3-4, 9-10, 12-14; 59-2 at 5-6, *sealed].

### III.    Standard Of Review

Under 29 U.S.C. § 1132(a)(1)(B), the Court applies either a de novo or an arbitrary-and-capricious standard of review. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Autran v. Procter & Gamble Health & Long-Term Disability Benefit Plan*, 27 F.4th 405, 411 (6th Cir. 2022). Where "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the Court applies an arbitrary-and-capricious standard. *Firestone Tire & Rubber*, 489 U.S. at 115; *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 441 (6th Cir. 2005). Here, both relevant Policies in the Plan gave Unum the "discretionary authority to make benefit determinations under the plan," including "determining eligibility for benefits," "resolving factual disputes, and interpreting and

enforcing the provisions" of each Policy [*See* Docs. 19-1 at 104; 19-14 at 11]. As the Parties agree, this language confers discretion to Unum [Docs. 28 at 1; 34 at 11; 44 at 9]. The Court therefore applies an arbitrary-and-capricious standard to review Unum's denial of Plaintiff's LTD and LWOP claims. *See, e.g.*, *McCatha v. Nat'l City Corp.*, 419 F.3d 437, 442 (6th Cir. 2005) (applying arbitrary-and-capricious standard of review where policy conferred the power "to construe and interpret this Plan and each Benefit Plan and to decide all questions of eligibility"). "The burden is on the claimant"—Plaintiff—to show that the decision of the fiduciary—Unum—"was arbitrary and capricious." *See Lloyd v. Procter & Gamble Disability Benefit Plan, Plan #501*, No. 20-4329, 2021 WL 4026683, at *5 (6th Cir. Sept. 3, 2021) (citing *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011)).

Under the arbitrary-and-capricious standard, the Court upholds a plan administrator's decision "as long as it [wa]s the result of a deliberate, principled reasoning process." *Sandeen v. Unum Grp. Corp.*, No. 22-5374, 2023 WL 2379012, at *2 (6th Cir. Mar. 7, 2023) (quoting *Autran*, 27 F.4th at 411); *see Holden v. Unum Life Ins. Co. of Am.*, No. 20-6318, 2021 WL 2836624, at *11 (6th Cir. July 8, 2021) ("[U]nder the arbitrary and capricious standard—the 'least demanding form of judicial review'—we ask only whether it is possible to offer an explanation for the outcome."). "Substantively, plan administrators may reach only those conclusions that are supported by substantial evidence in the administrative record." *Autran*, 27 F.4th at 412. The Court considers "only the evidence available to the administrator at the time the final decision was made." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014). And "[p]rocedurally, plan administrators must engage in reasoned decisionmaking." *Autran*, 27 F.4th at 412.

A number of factors bear on the Court's evaluation of the plan administrator's decision, including (1) the "quality and quantity of the medical evidence and the opinions on both sides of the issues;" *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003); (2) "whether the administrator contracted with physicians to conduct a file review as opposed to a physical examination of the claimant;" *Fura v. Fed. Exp. Corp. Long Term Disability Plan*, 534 F. App'x 340, 342 (6th Cir. 2013); and (3) whether the plan administrator operated "under a conflict of interest;" *Firestone Tire & Rubber*, 489 U.S. at 115. But "[n]one of the potentially relevant factors is dispositive in its own right; [the Court] must weigh them all when deciding whether the administrator's ultimate conclusion resulted from a rational process." *Autran*, 27 F.4th at 412. "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *McClain*, 740 F.3d at 1066 (quoting *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002)).

## IV.    Analysis

Plaintiff raised several bases that purportedly support a determination that Unum's denial of benefits was arbitrary and capricious. These broadly fall into three (3) categories. ***First***, Plaintiff challenged Unum's medical evaluation on appeal. He specifically contended that Unum's decision "rest[ed] on the opinion of one in house, non-examining, file reviewing nurse, and one non-examining file-reviewing internal medicine doctor" who "is not a specialist" in orthopedics [Doc. 34 at 9, 15]. Plaintiff also contended that Unum "discredit[ed] the opinions" of Plaintiff's "treating providers and an independent physician" and did not "seek another opinion" [*Id.* at 13, 16]. ***Second***, Plaintiff challenged Unum's "vocational analysis" both in the initial denial of his claims and on appeal, including that Unum (1) "used the wrong residence location,"

24

(2) "contradicted" itself by determining that Plaintiff "did have transferrable skills" after previously concluding he did not, and (3) provided an occupation that did not meet the gainful occupation requirement [*Id.* at 16, 18-19]. **Third**, through his supplement and 1,027 pages of discovery from Unum-related ERISA litigation dating back to 2004, Plaintiff alleged that a conflict of interest involving Defendants led to the inappropriate decision to terminate his claims [*See generally* Doc. 30]. The Court specifically addresses each category below but also concludes that none of the bases within each category, viewed individually or collectively, support a conclusion that Unum's decision was arbitrary and capricious. The record, instead, supports Unum's determination that Plaintiff did not qualify as "disabled" under the Policies.

### A. Unum's Procedural And Substantive Evaluation Of The Medical Evidence Was Reasonable.

Plaintiff focuses primarily on the medical review Unum conducted on appeal through its in-house medical professionals. But considering the entire record, Unum's evaluation of Plaintiff's appeal was reasonable and "resulted from a rational process." *See Autran*, 27 F.4th at 412. Collectively, Unum's reliance on its medical professionals' evaluations does not weigh in favor of finding that Unum's decision to terminate Plaintiff's claims was arbitrary and capricious.

### i. The Policies Do Not Provide Plaintiff The Right To A Review By A Doctor Who Specializes In Plaintiff's Condition.

As an initial matter, Plaintiff provides no legal basis for the Court to conclude that Unum's employ of a board-certified doctor in internal medicine—instead of a doctor in orthopedic medicine—to evaluate the record weighs in favor of discounting Unum's decision to terminate Plaintiff's claims. Neither Policy entitles Plaintiff to review by a physician with a specific specialty. Instead the Policies say Unum "may require you to be examined by a physician, other

25

medical practitioner, [and]/or vocational expert of our choice" [Docs. 19-1 at 82; 19-13 at 78].

And the Policies define "physician" as:

> - a person performing tasks that are within the limits of his or her medical license; and
> - a person who is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or
> - a person with a doctoral degree in Psychology (Ph.D. or Psy.D.) whose primary practice is treating patients; or
> - a person who is a legally qualified medical practitioner according to the laws and regulations of the governing jurisdiction

[Docs. 19-1 at 97; 19-14 at 1]. On appeal, the Policies provide that Unum "will consult with *a health professional with appropriate training and experience*" [Docs. 19-1 at 102; 19-14 at 9 (emphasis added)]. Plaintiff does not dispute that Dr. Schnars qualifies as a "physician" under the Policies. Nor does Plaintiff offer any evidence to suggest that Dr. Schnars lacks "appropriate training and experience." *See McConnell v. Nationwide Mutual Ins. Co. Benefits Administrative Committee*, No. 17-12869, 2018 WL 5306641, at *2 (E.D. Mich. Sept. 10, 2018) (holding that review of benefits claim for a PTSD disability by a board-certified doctor in neurological medicine—as opposed to psychiatric medicine—under a policy permitting review by "a health care professional with appropriate expertise in the medical field" was not arbitrary and capricious). Unum's reliance on the opinion of a physician who is board-certified in internal medicine does not support a finding that Unum's denial of Plaintiff's claims was arbitrary and capricious.

### ii. Unum Had A Reasoned Explanation To Reject The Opinions Of Drs. Dalal, Jarolem, And Mones.

"Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's

decision." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006) (citation omitted). Although a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician" or "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). When a plan administrator disagrees with the opinions of a treating physician, it must, however, "give reasons for adopting an alternative opinion." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006).

Here, Unum's decision to rely on the medical opinions of Dr. Schnars and Registered Nurse Tirabassi over those of Plaintiff's treating physicians was "based upon the evidence" and "a reasoned explanation." *See Evans*, 434 F.3d at 877. Neither Dr. Schnars nor Nurse Tirabassi engaged in an impermissible "selective review of the administrative record." *See Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (quoting *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381 (6th Cir. 2005)) (determining that a plan administrator's decision that "focused on slivers of information that *could be* read to support a denial of coverage and ignored—without explanation—a wealth of evidence that directly contradicted its basis for denying coverage" was arbitrary and capricious). Instead, both medical professionals comprehensively reviewed both the initial claims file, which included Dr. Dalal's 2014 IME, and new information and restrictions received on appeal from Dr. Mones and Dr. Jarolem.

Nurse Tirabassi "deferred" to Dr. Schnars's opinion, but Nurse Tirabassi also independently conducted a fulsome review of the record. She expressed concerns about the restrictions Dr. Jarolem recommended for Plaintiff after Dr. Jarolem only saw Plaintiff twice in

2018—after Unum had denied Plaintiff benefits—and did not order any diagnostic testing. Nurse Tirabassi also noted that Plaintiff did not participate in physical therapy, receive pain medication for his back pain, or see any other back-pain specialists. And to the extent Plaintiff challenges Unum's referral of Plaintiff's appeal to Nurse Tirabassi because of her training as a registered nurse, that challenge is without merit. *See Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013) ("This court has previously upheld the decision of a plan administrator where a nurse reviewed the medical evidence.").

For her part, Dr. Schnars also engaged in a thorough review of the record. She, too, could not reconcile the inconsistencies between Plaintiff's physicians' various recommended restrictions throughout the years, Plaintiff's own self-reported levels of activity, and an overall lack of recent clinical examination of or medication for any lower-back impairment. *See Holden*, 2021 WL 2836624, at *12 (approving plan administrator physicians' record review that "engaged with— and explained their disagreement with" "contradictory reports" of treating physicians); *Jackson v. Blue Cross Blue Shield of Mich. Long Term Disability Program*, 761 F. App'x 539, 545 (6th Cir. 2019) (approving plan administrator's rejection of treating physicians' evaluation that lacked any "reliable, valid, and reasonably compelling evidence"); *Raskin v. UNUM Provident Corp.*, 121 F. App'x 96, 100 (6th Cir. 2005) (noting that plan administrator "had good reasons to discount" treating physician's recommendations that lacked "clinical data"). Dr. Schnars noted that Dr. Dalal's 2014 restriction was more than four (4) years old. Since then, Plaintiff (1) had infrequently reported back pain to his other treating providers, (2) had not sought out or obtained clinical testing to support his assertions of pain, and (3) often exercised by lifting weights at or exceeding Dr. Dalal's weight restriction. Dr. Schnars also noted flaws in Dr. Jarolem's restriction. Specifically, Dr. Jarolem's five-pound (5 pound) restriction was not based on any medical or clinical testing.

28

*See Storms v. Aetna Life Ins. Co.*, 156 F. App'x 756, 758-59 (6th Cir. 2005) (approving plan administrator's decision to discount treating physician's opinion that "was not supported by objective medical data, useful analysis, or the other opinions in the record"). And Plaintiff's own reported activity of lifting ten-to-fifteen-pound weights did not correspond with Dr. Jarolem's five-pound restriction. Dr. Schnars and Nurse Tirabassi "engaged with—and explained their disagreement with" Dr. Dalal's out-of-date restrictions and Dr. Jarolem's unsupported restrictions. *See Holden*, 2021 WL 2836624, at *12; *Elliott*, 473 F.3d at 620. Unum's acceptance of its own treating providers' evaluation was, therefore, "supported by substantial evidence." *See Autran*, 27 F.4th at 412; *Evans*, 434 F.3d at 877.

As it relates to Dr. Mones, the timing and extent of his various opinions is less than clear, but the record simply does not support Plaintiff's contention that Unum was "quick to terminate" Plaintiff's claims and did not "wait[] for clarification" from Dr. Mones [Doc. 44 at 9]. In its initial review of Plaintiff's claims, Unum contacted Dr. Mones's office on multiple occasions, but Dr. Mones did not respond to Unum's requests for clarification. And on appeal, Dr. Schnars also attempted to contact Dr. Mones to understand the bases for his new opinion. *See Davis v. Hartford Life & Accident Ins. Co.*, 980 F.3d 541, 548 (6th Cir. 2020) (upholding plan administrator's decision to not credit treating physician's opinion that "conflicted with three other" opinions after treating physician "failed to respond to inquiries"); *Jackson*, 761 F. App'x at 545 (viewing favorably reviewing physicians' attempt to contact treating physician to discuss claimant's medical history). Dr. Mones's later-in-time, one-paragraph opinion that Plaintiff could not return to work did not reference any supporting medical tests or clinical diagnostics. *See McDonald*, 347 F.3d at 171 (discounting supplemental report in which physician "became more definite in his opinion" but did not re-examine claimant or receive "any new medical evidence or reports upon which to

29

base his clarified conclusion"). Without concrete data or other reliable evidence, it was not arbitrary or capricious for Dr. Schnars to discount Dr. Mones's opinion just as she discounted Dr. Jarolem's opinion. *See Black & Decker Disability Plan*, 538 U.S. at 834; *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 504 (6th Cir. 2010) (finding as reasonable plan administrator's reliance on reviewing doctor's evaluation that considered but rejected treating physician's observations and "unexplained" "apparent change" of opinion); *Creech v. Unum Life Ins. Co. v. N. Am.*, 162 F. App'x 445, at *8 (6th Cir. Jan. 9, 2006) (noting that treating physician's "failure to support his opinion with data or analysis is a sufficient reason to discount his opinion"); *Maleszewski v. Liberty Life Assur. Co. of Boston*, No. 9-13926, 2010 WL 1416995, at *10 (E.D. Mich. Apr. 8, 2010) ("[A]n opinion by a treating physician that a patient is disabled without explanation of how the physician arrived at that determination is entitled to little weight.").

Dr. Schnars's consideration of Plaintiff's existing medical record, activity levels, and limited reference to chronic pain in the months leading up to the denial of his claims, and the SSA ALJ's denial of benefits under the Social Security Act renders her evaluation even more reasonable. *See Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 312 (6th Cir. 2010) (upholding denial of disability benefits despite "some contradictory evidence" where the Social Security Administration also denied benefits under the Social Security Act). On this record, Unum had a reason to discount the medical opinions of Drs. Dalal, Jarolem, and Mones and rely on the opinions of Dr. Schnars and Nurse Tirabassi, which were supported by substantial evidence. *See Autran*, 27 F.4th at 415.

### iii. Under The Circumstances Present Here, Unum's Decision To Forgo An Independent Medical And In-Person Evaluation Was Permissible.

Unum's election to forgo an in-person or independent medical evaluation of Plaintiff also fails to suggest that the denial of Plaintiff's claims was arbitrary and capricious. "[A] file review

30

by a qualified physician in the context of a benefits determination" is not "inherently objectionable." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005). But "[a] plan's decision to conduct a file-only review—'especially where the right to [conduct a physical examination] is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.'" *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006) (quoting *Calvert*, 409 F.3d at 296). Here, both Policies provide that Defendants (1) may require a claimant "to be examined by a physician [or] other medical practitioner" and (2) "can require an examination as often as it is reasonable to do so" [Docs. 19-1 at 82; 19-13 at 78]. But "there is nothing in the plan language that expressly *bars* a file review by a physician in lieu of such a physical exam." *See Calvert*, 409 F.3d at 295. Defendants' decision to conduct a file-only review of Plaintiff's claims does not, on its own, lead to the conclusion that denying Plaintiff's claims was not thorough or accurate. *See id.*

Nor did Dr. Schnars's file-only review involve an impermissible credibility determination. A plan administrator's decision not to conduct an independent medical evaluation may be arbitrary and capricious if "the file reviewer concludes that the claimant is not credible without having actually examined him or her." *See Judge*, 710 F.3d at 663; *Bennett v. Kemper Nat. Servs., Inc.*, 514 F.3d 547, 555 (6th Cir. 2008) (concluding reviewing physician made a credibility determination by dismissing claimant's assertions of pain as "exaggerati[on]" and "embellish[ment]"). Dr. Schnars expressly referenced Plaintiff's continued assertions of lower back pain, but she noted that the medical records did not support those assertions. *See Holden*, 2021 WL 2836624, at *13 (rejecting contention that plan administrator made credibility determinations when it "appears to have based its decision by *crediting* [claimant's] own statements"). She did not dismiss Plaintiff's complaints outright. *Compare Judge*, 710 F.3d at

31

663 (holding that plan administrator did not act arbitrarily or capriciously in conducting a file-only review where reviewers "made no credibility determinations," "not[ed] where the reports lack[ed] objective medical evidence," and "point[ed] out the internal inconsistencies"), *and Bell v. Ameritech Sickness & Accident Disability Benefit Plan*, 399 F. App'x 991, 1000 (6th Cir. 2010) ("[N]either the Plan nor the [reviewing] doctors rendered credibility determinations . . . they simply determined that the objective medical documentation in the record did not, on its own, support a finding of disability. This was not improper or arbitrary, but rather was consistent with the Plan's definition of disability."), *with Bennett*, 514 F.3d at 555. To be sure, Plaintiff's lower back pain is of a type that "is not easily subject to objective verification." *See Shaw v. AT & T Umbrella Ben. Plan No. 1*, 795 F.3d 585, 550 (6th Cir. 2015). Even so, "an award of disability for back pain should be based on objective medical evidence rather than on the claimant's subjective complaints." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 171 (6th Cir. 2007). For the reasons previously discussed, the objective medical record—which did not include a request or recommendation for pain medication or indicate that Plaintiff was attending the recommended physical therapy—and Plaintiff's own reported activities simply did not support the proposed restrictions of Plaintiff's physicians. *See Judge*, 710 F.3d at 663.

Unum's election to not physically examine Plaintiff is all the more reasonable because under the Policies, the claimant has the burden to submit "proof of continuing disability" and "proper proof that you remain disabled" [*See* Docs. 19-1 at 87; 19-13 at 77]. *See Filthaut v. AT&T Midwest Disability Benefit Plan*, 710 F. App'x 676, 685 (6th Cir. 2017). On this record, Unum's decision to forgo conducting an independent medical evaluation of Plaintiff does not weigh in favor of a finding that Unum's ultimate decision to terminate Plaintiff's claims was arbitrary and capricious.

### B. Unum's Vocational Analysis Was Not Flawed.

Plaintiff also finds fault with Unum's vocational analysis, specifically its (1) use of the Miami job market, (2) conclusion that Plaintiff had transferrable skills, and (3) inclusion of an occupation that did not meet the gainful occupation requirement. But each of these purported "errors" fails to weigh in favor of a conclusion that Unum's procedural evaluation of Plaintiff's claims was arbitrary and capricious.

*First*, the record supports Unum's use of the Miami job market. Plaintiff (1) spent time in Miami beginning in 2012, (2) saw several physicians in Miami over the years, (3) had his mail directed to Miami, and (4) self-reported to Unum on September 22, 2017 that he lived in Miami. After the September 22, 2017 call, Unum's disability benefit specialist inquired whether Plaintiff would have skills that could transfer to less physically demanding occupations "in Miami, FL at the time/current" to evaluate potential gainful occupations for which Plaintiff would be "reasonably fitted by education, training, or experience" [*See* Docs. 19-4 at 103; 19-1 at 82 (LTD Policy); 19-13 at 77 (LWOP Policy)]. The vocational analysis conducted as part of Unum's Fall 2017 review used Plaintiff's self-reported location—Miami, Florida. Unum's decision to use Miami as the current market for Plaintiff's claims was not, as Plaintiff contends, "improper and self-serving" [Doc. 34 at 18]. Instead, the decision was based on the information Plaintiff, himself, provided to Unum. And Unum had no reason to question the veracity of Plaintiff's statement regarding his residence. Unum's decision to evaluate the Miami job market, therefore, "resulted from a rational process." *See Autran*, 27 F.4th at 412.

*Second*, Plaintiff inaccurately claims that Unum "contradict[s]" itself by determining that Plaintiff had skills for gainful occupations for which he was "reasonably fitted by education, training or experience" in 2017 "based on the same occupational information" from 2014

[Doc. 44 at 13]. Unum conducted a skills assessment for Plaintiff in August of 2014 based on "Sedentary or Light physical demand levels" "in Memphis, TN" [Doc. 19-2 at 188]. That assessment concluded it was "unlikely" that Plaintiff "would have **sufficient** skills for gainful alternate occupations within the Sedentary or Light physical demand levels as defined by eDOT" [Doc. 19-2 at 188 (emphasis added)]. The assessment did not evaluate Plaintiff's "transferrable" skills [*Id.*]. Unum's VRC Parras-Potenzo conducted an additional skills assessment in May 2016 [Doc. 19-3 at 42]. She concluded that Plaintiff "would have skills for less physically demanding occupations" but "th[o]se occupations would not provide a gainful [occupation] wage" "in Memphis, TN" [*Id.*]. Plaintiff's changed circumstances in September 2017 impacted Unum's third skills assessment. By that time, the SSA ALJ determined that Plaintiff could engage in work at the "***light*** occupational base" [Doc. 19-4 at 81 (emphasis added)]. And Plaintiff had self-reported that he lived in downtown Miami. Parras-Potenzo reviewed (1) "all occupational and vocational evidence provided," "including analysis of current limitations and restrictions by medical and clinical personnel," and (2) Plaintiff's past employment history, including his certifications, to conclude that Plaintiff "had demonstrated skills/competencies" in seven (7) core competencies [*Id.*]. Based on this information, she concluded that Plaintiff "would have skills for alternate occupations which are performed with occasional lifting up to 20 pounds, frequently up to 10 pends; frequent sitting with occasional standing, walking with ability to make positional" changes [*Id.* at 105-06]. Unum's determination that Plaintiff had transferrable skills reflects the reality of Plaintiff's changed capacity and job market.

***Third***, Unum's inclusion of an occupation that did not meet the gainful occupation requirement does not render the otherwise thorough vocational analysis fatally flawed or change the outcome. Plaintiff faults Unum's use of the "Security Guard" occupational title with a median

34

hourly wage of $13.57, which falls below the calculated gainful occupation wage of $13.68 [*See* Doc. 19-12 at 116]. Unum specifically noted in its Appeal Decision that "[t]he occupation of Security Guard is gainful" under the LWOP Policy but not the LTD Policy [*Id.*]. But the inclusion of this position does not render the entire decision to deny Plaintiff's claims arbitrary and capricious. The Policies defined "disabled" as when "you are unable to perform the duties of ***any*** gainful occupation" [Docs. 19-1 at 82; Doc. 19-13 at 76-77, 100 (emphasis added)]. The two (2) other alternate occupational titles—Inspector Component Parts and Final Inspector—had income exceeding the gainful occupation wage. With at least one gainful occupation included in the denial letter—satisfying the requirements of the Policies—Unum's vocational analysis was the product of "reasoned decisionmaking." *See Autran*, 27 F.4th at 412.

### C. Defendants' Conflict Of Interest Does Not Weigh In Favor Of A Conclusion That The Decision To Terminate Plaintiff's Benefits Was Arbitrary And Capricious.

If a plan administrator operates "under a conflict of interest, th[e] conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone Tire & Rubber*, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187 cmt. d (1959)). "[T]he fact that a plan administrator both evaluates claims for benefits and pays benefits claims" creates a conflict of interest. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008); *see also Rothe v. Duke Energy Long Term Disability Plan*, 688 F. App'x 316, 319 (6th Cir. 2017). The use of "in-house consultants" who could "have an incentive to make a finding of 'not disabled' in order to save their employers money and preserve their own consulting arrangements" may also create a conflict of interest. *See Black & Decker*, 538 U.S. at 832.

But conflicts of interest "prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example,

by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.* at 117. Ultimately, the Court gives "more weight to the conflict in circumstances that suggest a higher likelihood that [the conflict] affected the benefits decision." *Rothe*, 688 F. App'x at 319. But "[m]ere allegations of the existence of a structural conflict of interest are not enough to show that the denial of a claim was arbitrary; there must be some evidence that the alleged conflict of interest affected the plan administrator's decision to deny benefits." *Jackson v. Metro. Life*, 24 F. App'x 290, 292 (6th Cir. 2001). Plaintiff must "provide 'significant evidence' that the conflict actually affected or motivated the decision at issue." *Cooper*, 486 F.3d at 165 (quoting *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998)). Conjecture is not enough. *See id.*

Plaintiff has not provided significant evidence that the use of in-house medical professional reviewers affected Unum's decision to terminate Plaintiff's benefits. Plaintiff's discussion of former in-house physicians' "bonuses" in other cases does not shed light on the benefits decision in this case. Plaintiff specifically takes issue with Dr. Schnars. But Plaintiff has not showed that Dr. Schnars was biased in reviewing Plaintiff's claim or received any "bonus" for recommending that Unum deny Plaintiff's appeal. *Compare DeLisle v. Sun Life Assur. Co. of Can.*, 558 F.3d 440, 445 (6th Cir. 2009) (giving "more weight" to a conflict presented by file reviewers "under regular contract" with defendants where plaintiff provided evidence that reviewers received "incomplete and potentially prejudiced information" that "portray[ed] the claimant in a negative light"), *and Evans*, 434 F.3d at 880 (finding "significant evidence" of a conflict where "a series of inter-office e-mails and memos" between reviewers suggesting "a predisposition toward terminating"), *with Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 507 (6th Cir. 2008)

36

(refusing to discount in-house reviewer's medical opinion where plaintiff "offered only conclusory allegations of bias," "failed to present any statistical evidence" to show reviewer "consistently opined that claimants are not disabled," and provided "no evidence" that defendants "attempted to tamper with or inappropriately influence" reviewer). Without evidence, Plaintiff cannot show that this conflict affected Defendants' decision here. *See Cooper*, 486 F.3d at 165; *Cook v. Prudential Ins. Co. of Am.*, 494 F. App'x 599, at *5 (6th Cir. Aug. 16, 2012) (rejecting contention of bias supported by "no more than cursory statements").

Plaintiff states that "Courts have repeatedly found" Dr. Schnars's "opinions to be not worthy of giving weight" [Doc. 64 at 4]. Significant evidence of a conflict may arise from "evidence that the consulting physician's (i.e., the reviewing physician's) 'conclusions have been questioned in at least three federal cases,' with those prior courts noting, for example, that the reviewing physician's language 'appears deliberately ambiguous and vague.'" *Holden*, 2021 WL 2836624, at 17 n.21 (quoting *Elliot*, 473 F.3d at 620). Plaintiff references opinions from five (5) federal courts that have "overturned Unum's decision, which was based on Dr. Schnar's [sic] medical opinion" [Doc. 64 at 4]. But a substantive review of those opinions—several of which involved de novo review—does not suggest that those courts each specifically questioned Dr. Schnars's conclusions. Only one case specifically addressed Dr. Schnars's "brief opinion" that contained a "handful of sentences." *See Anderson-Posey v. Unum Life Ins. Co. of Am.*, 237 F. Supp. 3d 1144, 1155 (N.D. Okla. 2017) (applying an arbitrary-and-capricious standard of review). For the reasons previously discussed, Dr. Schnars's review in the case before this Court was thorough—Dr. Schnars considered Plaintiff's occupational duties, medical records, and report of pain.

37

Additionally, Plaintiff has not presented concrete evidence suggesting that Defendants' business structure affected its decision here. To be sure, Defendants' role as plan administrator and payor of any benefits creates a conflict of interest. *See Metro. Life Ins.*, 554 U.S. at 112. But as an initial matter, Plaintiff has not meaningfully connected his general reference to Defendants' "corporate practice" of "closure quotas" "in the late 1990s through the early 2000s" that allegedly "has not changed" to this case [*See* Doc. 30 at 3, 8]. *See Frost v. Unum Life Ins. Co. of Am.*, No. 21-CV-269, 2023 WL 2261415, at *18 (E.D. Tenn. Feb. 14, 2023) (rejecting "1,000 pages of evidence of purported bias" because most "relates to events that took place as many as 15 years before [the plaintiff's] claim was submitted"). To the extent that Plaintiff does provide evidence of a conflict here, there is no "significant evidence" that the conflict infiltrated Defendants' decision in this case. *See Cooper*, 486 F.3d at 165.

Plaintiff focuses on Director Ridlon's knowledge of financial weekly tracking reports provided by Unum's financial department. But any connection between Ridlon's "pattern of consistently meeting or exceeding the recovery plan" and speculative pressure Ridlon felt to terminate Plaintiff's claims is tenuous at best. The record reflects that Ridlon had little involvement in the overall evaluation of Plaintiff's claims. The involvement that Ridlon did have occurred while Defendants paid Plaintiff benefits and transferred his case for "ongoing handling" in 2016 [*See* Docs. 19-2 at 29-30; 19-4 at 29-30, 61]. Ridlon did not approve the denial of Plaintiff's claims [Doc. 19-4 at 185-86]. The favorable treatment Plaintiff received over several years while Ridlon oversaw Plaintiff's claims belies the suggestion of Ridlon's improper bias. *See Sandeen v. Paul Revere Life Ins. Co.*, No. 18-CV-248, 2022 WL 966848, at *14-15 (E.D. Tenn. Mar. 30, 2022) (holding that financially-based conflict of interest did not "heavily influence[] the decision to deny" benefit claims where defendants "made decisions beneficial to" plaintiff), *aff'd*

*sub nom. Sandeen*, 2023 WL 2379012.  What is more, Plaintiff does not suggest, and the record does not reflect, that any of the disability benefit specialists, vocational rehabilitation consultants, or medical reviewers who thoroughly evaluated Plaintiff's claims and appeal over a period of years had any access to the financial weekly tracking reports.  *See Schwalm*, 626 F.3d at 312 (concluding plan administrator and payor "thorough[ly] review[ed] the record" such that there was "no indication that the review was improperly influenced by the inherent conflict of interest).  On this record, the Court cannot conclude that Defendants' structural conflict of interest affected its decision to deny Plaintiff's claims or otherwise weighs in favor of a conclusion that Defendants' denial of Plaintiff's claims was arbitrary and capricious.

## V.     Conclusion

Defendants' decision to deny Plaintiff's claims for LTD and LWOP benefits resulted from "a deliberate, principled reasoning process" and was "supported by substantial evidence." *Sandeen*, 2023 WL 2379012, at *2.  That decision, therefore, was not arbitrary and capricious. Accordingly, the Court **GRANTS** Defendants' "Motion for Judgment on the Record" [Doc. 27] and **DENIES** Plaintiff's "Motion for Judgment on ERISA Record" [Doc. 33].  This case is dismissed.  An appropriate judgment shall enter.

IT IS SO ORDERED.

s/ Katherine A. Crytzer
KATHERINE A. CRYTZER
United States District Judge